**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**MATTHEW PAPA and ELIZABETH REUSSWIG, as**
**Co-Administrators of the ESTATE OF JOSEPH**
**A. PAPA,**

                    **Plaintiffs,**

          **v.**                                            **No. 1:17-cv-898**

                                                              **(TJM/CFH)**

**UNITED STATES OF AMERICA,**

                    **Defendant.**
_____

**THOMAS J. McAVOY,**
**Senior United States District Judge**


**DECISION & ORDER**

          Before the Court is the Defendant's motion for summary judgment.   See dkt. # 47.

The parties have briefed the issues, and the Court has determined to decide the matter

without oral argument.

**I.      Background**

          This case arises out of the medical treatment Decedent Joseph A. Papa received at

the Albany Veterans Administration Medical Center ("Albany VAMC") from July to

September 2015.  Plaintiffs, who are two of the children and the administrators of Joseph

Papa's estate, allege that medical personnel a the Albany VAMC committed medical

malpractice and injured Joseph Papa when they intubated him to facilitate operation of a

mechanical respirator.

1

At the close of discovery, Defendant filed the instant motion for summary judgment. The Northern District of New York's Local Rules provide that a party who files a motion for summary judgment must file "a separate Statement of Material Facts." Northern District of New York Local Rule 56.1(a). That statement must "set forth, in numbered paragraphs, a short and concise statement of each material fact about which the moving party contends there exists no genuine issue." Id. The party must "set forth a specific citation to the record where the fact is established." Id. The "record" in such cases "includes the pleadings, depositions, answers to interrogatories, admissions and affidavits." Id.

The Rules require the non-moving party to file a response to the moving party's statement. L.R. 56.1(b). That Rule provides:

> The opposing party shall file a separate Response to the Statement of Material Facts. The opposing party's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in a short and concise statement, in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The Court may deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert. In addition, the opposing party's Response may set forth any assertions that the opposing party contends are in dispute in a short and concise Statement of Material Facts in Dispute, containing separately numbered paragraphs, followed by a specific citation to the record where the fact is established. The moving party may reply to the opposing party's contended assertions in a separate Reply Statement and/or its Reply Memorandum of Law.

L.R. 56.1(b) (emphasis in original).

Defendant's motion for summary judgment contained the statement required by the rules. See dkt. # 47-1. Plaintiffs responded. Their response mirrored the paragraphs in the Defendant's statements, but those responses contained no citations to the record. Plaintiffs appear to have addressed this failing with an introductory paragraph, stating:

> Defendant's submission of a Statement of Material Facts cites and references

2

uncorroborated medical records rendering it difficult to admit or deny the accuracy thereof.  In addition, plaintiffs cannot accurately admit or deny defendant's Statement of Material Facts as to plaintiff's expert's [deposition] representations as his answers were premised upon the representation that he did not acknowledge the accuracy of the Hospital medical records and reports.

Plaintiffs' Response to Defendant's Statement of Material Facts, dkt. # 50-6, at 1.

The Court finds that Plaintiffs' response to the Defendant's statement does not comply with the requirement in the rules that denials be accompanied to citations in the record where a factual dispute exists.  Plaintiffs complain that the medical records cited by the Defendant have not been corroborated.  The Court is uncertain what information is necessary to "corroborate" a medical record.  The record speaks for itself.  Testimony from some other person or source might call into doubt evidence in the medical record and create an issue of fact, but at this point in the litigation Plaintiffs would need to point to some such evidence.  Plaintiffs' blanket statement that the records have not been "corroborated" does not create an issue of fact with respect to the information contained in the records. Likewise, Plaintiffs do not argue that the records are inauthentic or fabricated, or that they would be inadmissible at trial.  By failing to point to anything in the record to dispute the information in the medical records, Plaintiffs have failed to oppose the facts alleged in Defendant's statement.  The Court will accept them as true where supported by the citations to the record.

Plaintiffs' suggestion that they cannot "accurately admit or deny" Defendant's statements about the testimony of their expert because the expert "did not acknowledge the accuracy of the Hospital medical records and reports" is similarly nonsensical.  With reference to Defendant's statements of material fact concerning Plaintiffs' expert, Plaintiffs deny a claim that Plaintiffs' counsel wrote the expert report but offer no record citations.

3

They also fail to cite the record when they deny a claim that the expert "disclaimed the opinion contained in his written report that the standard for intubating a patient in the emergency room requires the use of bite-prevention devices or equipment."  Plaintiffs otherwise admit the truth of other statements about the expert's testimony.  For some of those statements, Plaintiffs admit them "with reservation noted during the" deposition.  They do not cite to any pages of the deposition where such "reservations" appeared. The Court must therefore conclude that Plaintiffs have not properly opposed the facts claimed in these paragraphs either.[1]

In other words, for the purpose the instant motion, the Court will consider all facts alleged and properly supported in the record to be true.  Plaintiffs failed in their obligation to point the Court to portions of the record that supported their opposition to the Defendant's motion, and that failure has consequences.

The evidence in this case indicates that Joseph Papa was an 86-year-old veteran when he was hospitalized at the Albany VAMC from July 22, 2015 until he died on September 8, 2015.  Defendant's Statement of Material Facts ("Defendant's Statement"), dkt. # 47-1, at ¶ 1.  When admitted, Papa had a medical history of coronary artery disease, congestive heart failure, poorly controlled type II diabetes, anemia, chronic kidney disease, a history of gastro-intestinal bleeding, and chronic blood loss.  Id. at ¶ 2.  These conditions dated to 2005.  Id.  Decedent had recently been hospitalized twice.  Id. at ¶ 3.  In June 2015, Papa underwent a catheterization of three cardiac vessels after a heart attack.  Id.  In

---

[1]The Court notes that Defendant has not filed a separate opposition to the additional facts alleged in Plaintiffs' response.  The Rules cited above impose no such requirement on the Defendant, though a formal opposition would make the Court's evaluation here easier.

March 2015, he suffered a gastrointestinal bleed that required multiple blood transfusions.
Id.

Joseph Papa appeared at the emergency department at the Albany VAMC on July
22, 2015, complaining of shortness of breath and chest pressure.  Id. at ¶ 4.  Dianna
Langdon, MD, evaluated him at approximately 11:07 p.m., finding Papa in respiratory
distress with an oxygenation saturation level of 85%.  Id. at ¶¶ 5-6.  "An IV was started and
he was administered oxygen."[2]  Id. at 7.[3]  Decedent underwent a portable chest x-ray, which
showed pulmonary edema.  Id. at ¶ 8.  That edema, combined with elevated proteins
created by the heart when working harder than normal, suggested congestive heart failure.
Id.  The medical records indicate that Papa "was 'intubated with [a] glidescope without
difficulty.'"  Id. at ¶ 9.  Dr. Langdon concluded that Papa suffered from "'respiratory failure
CFH [congestive heart failure]/pumonary edema.'"  Id.  Without citing to any evidence,
Plaintiffs deny that the intubation occurred without difficulty, and that Dr. Langdon offered
that assessment.  Plaintiffs' Response at ¶ 9.  Decedent "was admitted to the Medical
Intensive Care Unit."  Id. at ¶ 10.  He had a diagnosis of "shock and pulmonary edema."  Id.
Someone made Papa's family aware that he had a "poor prognosis."  Id.

During his hospital stay, decedent developed kidney necrosis, which progressed to

---

[2]Defendant's use of the passive voice does not indicate who initiated this therapy,
though the Court presumes medical personnel did.  Legal writing teachers discourage
using the passive voice for a reason.

[3]Plaintiffs' response "admit[s] the medical records disclose defendant's contention."
Plaintiffs' Response to Defendant's Statement of Material Facts ("Plaintiffs' Response"),
dkt. # 50-8 at ¶ 7.  Plaintiffs appear here to imply that the medical records are not
trustworthy, but do not cite to any evidence to challenge the information contained in those
records.  They offer the same response in paragraphs 7-8, 10-13, 15-22, 27-28, 30-37,
and 42.

end-stage renal disease.  Id. at ¶ 11.  He needed regular dialysis.  Id.  Medical staff

attempted to extubate Papa on July 29, 2015, but Papa could not sustain adequate

oxygenation because of excessive swelling in the gottis, a poor gag reflex, and secretions.

Id. at ¶ 12.  Staff re-inserted the tubing that same day.  Id.  at ¶ 13.  Papa developed

pneumonia, which doctors treated with antibiotics.  Id.  Decedent also developed several

pulmonary emboli, which are blood clots that travel to the lungs.  Id. at ¶ 14.  Papa's chronic

anemia complicated treatment of the emboli.  Id. at ¶ 15.  Doctors could not use the blood

thinners they often use to prevent emboli because of the anemia.  Id.

Papa also developed liver failure related to shock.  Id. at ¶ 16.  The medical records

indicate that decedent had an advance directive beginning on August 31, 2015.  Id. at ¶ 17.

The directive prohibited use of extraordinary measures "including resuscitation and

intubation."  Id.  The records further indicate that Decedent's family requested that he be

removed from a ventilator, moved out of the ICU and onto a regular floor for palliative care.

Id.  at ¶ 18.  James Papa died on September 8, 2015.  Id. at ¶ 19.

James Papa arrived at the Emergency Department on July 22, 2015 in shock and in

acute respiratory failure.  Id. at ¶ 20.  He required placement of a breathing

tube–intubation–and mechanical ventilation.  Id.  Someone–defendant uses the passive

voice and does not disclose the actor–gave Papa 4 milligrams of midazolam, a sedative.  Id.

at ¶ 21.  Medical personnel used a video laryngoscope (Glidescope) to perform the

intubation.  Id. at ¶ 22.  That instrument is placed at the base and right side of the tongue to

view the vocal chords.  Id.  The part of the Glidescope placed on the tongue, which is called

the "blade," is plastic.  Id. at ¶ 23.  Plaintiffs deny this statement, but they do not point to any

evidence of record that supports their denial, nor do they offer any explanation.  Plaintiffs'

6

Response at ¶ 23.  The tip of the Glidescope is placed far into the back of the throat during intubation.  Defendant's Statement at ¶ 24.  This part of the Glidescope, Defendant claims, is "well behind the area of the tongue that was injured."  Id.  Plaintiffs, again without citing to any evidence or providing an explanation, deny this statement.  Plaintiffs' Response at ¶ 24.

Records reflect that "[v]isulization of the vocal chords was good during the intubation."  Defendant's Statement at ¶ 25.  Medical personnel needed only one attempt to place the endotracheal tube.  Id.  ¶ 26.  Plaintiffs deny the quality of the visualization and the number of attempts necessary to place the tube.  Plaintiffs' Response at ¶¶ 25-26.  They again cite no evidence in their denials.  Id.  A note on the intubation indicated that the view of the vocal chords was a grade I Cormak-Lehane scale view.  Defendant's Statement at ¶ 27.  Defendant does not attempt to explain this scale.  Id.  The records describe the intubation as "uncomplicated."  Id. at ¶ 28.  Those records also describe the intubation as complete on the first attempt.  Id. at ¶ 29.  The intubation note does not record trauma to the tongue or any bleeding.  Id. at ¶¶ 30-31.

Medical records made at the time of James Papa's admission to the hospital Intensive Care Unit on July 23, 2015 show that he was intubated and required mechanical ventilation.  Id. at ¶ 32.  A pain assessment note entered into the medical record at 3:43 a.m. stated that Papa was not experiencing and pain and appeared comfortable.  Id. at ¶ 33.[4]  Dr. George Soryal entered a physical exam note at 12:33 p.m. that indicated "no oral lesions."  Id. at ¶ 34.  At 6:52 p.m. on July 23, 2015, notes in the medical record indicate that Joseph Papa suffered from "muscosa dry," but did not find any mention of bruising or

_____

[4]Plaintiffs' Response to Defendant's statement of material facts omits paragraph 32.  See Plaintiffs' Response.

hematoma on the tongue.  Id. at ¶ 35.  A nurse's note at 9 p.m. on that day reports "mucosa dry (tongue bruised)."  Id. at ¶ 36.  Between 6:52 p.m. and 9 p.m. the records reflect that Papa was receiving midazolam and fentanyl.  Id. at ¶ 37.  Those records reported that he was sedated and unable to follow commands.  Id.  The 9 p.m. record was the first record that reported any injury to the tongue.  Id. at ¶ 38.  Plaintiffs deny this claim, but do not point to any evidence to support their denial.  Plaintiffs' Response at ¶ 38.

On July 24, 2015, a nursing assessment found that Joseph Papa had a "'dark bruise on [his] tongue.'" Defendant's Statement at ¶ 39.  Dr. Soryal made a similar notation later in the day, finding "'a small hematoma'" on Papa's tongue.  Id. at ¶ 40.  The records also noted bruising on Joseph Papa's left abdomen, both arms, and right hip on July 23, 2018.  Id. at ¶ 41.  The records do not provide information on the source of that bruising.  Id.  Plaintiffs dispute this claim, but again fail to point to any record evidence to support their denial.  Plaintiffs' Response at ¶ 41.

Bruising is not uncommon on critically ill patients.  Defendant's Statement at ¶ 42.  Defendant contends that Papa's critical illness and liver failure made him predisposed to easy bruising and bleeding.  Id. at ¶ 43.  That condition, Defendant claims, also predisposed him to tissue breakdown of the tongue.  Id. at ¶ 44.  Defendant's expert also asserts that critical illness often produces agitation among patients undergoing mechanical ventilation.  Id. at ¶ 45.  Some of the medications Papa took on July 23, 2015, including propofol and midazolam are often used to treat anxiety and agitation for patients in intensive care.  Id. at ¶ 46.

An otolaryngologist–an ear, nose, and throat specialist–saw Papa on July 30, 2015.  Id. at ¶ 47.  He noted a 5cm x 3cm eschar on the tip of Papa's tongue.  Id.  An eschar is an

8

area of dead tissue.  <u>Id.</u>  On August 3, 2015, this specialist concluded that the eschar appeared to be "'close to sloughing off,'" and that otherwise the tongue appeared healthy.  <u>Id.</u> at ¶ 48.  Defendant's expert concluded that the injury to the tongue was inconsistent with a bite injury.  <u>Id.</u> at ¶ 49.  Papa did not have upper teeth.  <u>Id.</u> at ¶ 50.

Plaintiffs offer additional statements of material fact.  They cite to the medical records, even though these appear to be the same records they contend cannot be "corroborated."  In the interest of completeness, the Court will narrate those statements as well.

Plaintiffs state that a "'dark bruise'" had appeared on decedent's tongue within twenty-four hours of his intubation on July 22, 2015.  Plaintiffs' Response at ¶ 61.  The records note a "small hematoma" on the same date.  <u>Id.</u> at ¶ 62.  The records further record a "tongue bruise" on the same day.  <u>Id.</u> at ¶ 63.  Other records also indicate bruising, including a 1 cm hematoma to the left side of the tongue.  <u>Id.</u> at ¶¶ 65-66.  Plaintiffs also point to records that indicate that, on July 22, 2015, Papa "was in pain because of intubation, noted through grimacing."  <u>Id.</u> at ¶ 64.  Papa's family took a photograph of this injury in late August 2015.  <u>Id.</u> at ¶ 67.

A July 30, 2015[5] consultation report recorded "'necrotic tongue s/p biting during initial intubation."  <u>Id.</u> at ¶ 68.  That same day, a note from providers indicated a 3 cm by 5 cm black eschar.  <u>Id.</u>  Plaintiffs allege that the records "noted the existence of tongue trauma as a result of biting during the intubation process."  <u>Id.</u> at ¶ 69.  Plaintiffs point to other parts of the medical that indicate injury to the tongue and a scab on the tongue.  <u>Id.</u> at ¶ 70-71.  By

_____

[5]Plaintiffs' statement records the date as July 30, 2021.  Context makes clear that the events occurred in 2015.  The Court assumes a typographical error.

August 18, 2015, records described the tongue as "lacerated and necrotic."  Id. at ¶ 72.

"Several weeks later and more than five weeks after the condition the subject of the pending

action first developed," Plaintiffs claim, "defendant's representatives" found that Papa's

tongue condition occurred because "of a 'prolonged intubation period.'" Id. at ¶ 73.  The

Plaintiffs contend that the medical records indicate that the injury occurred due to biting, but

that Defendant's expert reports that such biting was not likely to cause Papa's tongue injury.

Id. at ¶ 78.

The administrators of Papa's estate filed their Complaint in this court on August 16,

2017.  See dkt. # 1.  The Complaint alleged medical malpractice, wrongful death, and loss

of consortium for Emma Papa, the Decedent's wife.  On December 28, 2020, the parties

filed a stipulation discontinuing with prejudice the Plaintiffs' wrongful death and loss of

consortium claims.  Emma Papa voluntarily terminated herself from the action.

The Defendant answered the Complaint and the parties engaged in discovery.  At

the close of discovery the Defendant filed the instant motion for summary judgment.  The

parties then briefed the issues, bringing the case to its present posture.

## II.    Legal Standard

Defendant seeks summary judgment.  It is well settled that on a motion for summary

judgment, the Court must construe the evidence in the light most favorable to the

non-moving party, see Tenenbaum v. Williams, 193 F.3d 581, 593 (2d Cir. 1999), and may

grant summary judgment only where "there is no genuine issue as to any material fact and

... the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a).  An

issue is genuine if the relevant evidence is such that a reasonable jury could return a verdict

for the nonmoving party.  Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).

10

A party seeking summary judgment bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the moving party believes demonstrate the absence of a genuine issue of material fact as to a dispositive issue.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the movant is able to establish a *prima facie* basis for summary judgment, the burden of production shifts to the party opposing summary judgment who must produce evidence establishing the existence of a factual dispute that a reasonable jury could resolve in his favor.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  A party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in his pleadings, Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525-26 (2d Cir. 1994), or on conclusory allegations or unsubstantiated speculation. Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998).

**III.    Analysis**

Defendant argues that the United States is entitled to summary judgment on Plaintiffs' medical malpractice claim regarding the injury to Papa's tongue, the only claim remaining in this action.

**A.    Medical Malpractice**

Plaintiffs brought their claims pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346 and 2671, et seq.  The parties agree that New York law applies to the malpractice claim that remains in this action.  See, e.g., Agyin v. Razmzan, 986 F.3d 168, 184 (2d Cir. 2021).  In New York, a plaintiff asserting medical malpractice "'must prove (1) that the defendant breached the standard of care in the community, and (2) that the breach

proximately caused the plaintiff's injuries." Milano by Milano v. Freed, 64 F.3d 91, 95 (2d Cir. 1995) (quoting Arkin v. Gittleson, 32 F.3d 658, 664 (2d Cir. 1994)).  "A defendant in a medical malpractice action establishes prima facie entitlement to summary judgment by showing that in treating the plaintiff, he or she did not depart from good and accepted medical practice, or that any such departure was not a proximate cause of the plaintiff's alleged injuries." Anyie B. v. Bronx Lebanaon Hosp., 128 A.D.3d 1, 3 (1st Dept. 2015).  If the defendant meets this burden, "the plaintiff must rebut the prima facie showing via medical evidence attesting that the defendant departed from accepted medical practice and that such departure was a proximate cause of the injuries alleged." Id.  Expert testimony that a defendant's treatment fell below the relevant standard of care can overcome a motion for summary judgment, but "the expert's opinion 'must demonstrate the requisite nexus between the malpractice allegedly committed and the harm suffered.'" Id. (quoting Dall-Stephenson v. Waisman, 39 A.D.3d 303, 307 (1st Dept. 2007) (internal quotations omitted)). In most cases, "a plaintiff . . . must introduce expert testimony to establish the relevant medical standards that were allegedly violated." Olivier v. Robert L. Yeager Mental Health Ctr., 398 F.3d 183, 190 (2d Cir. 2005).  The testimony of an expert is unnecessary when "'a deviation from a proper standard of care" is "so clear and obvious that it will be within the understanding of the ordinary layman without the need for expert testimony.'" Id. (quoting Sitts v. United States, 811 F.3d 736, 740 (2d Cir. 1987)).  Even under such circumstances, however, "expert testimony may be required to prove the negligence was the proximate cause of the injury complained of." Sitts, 811 F.2d at 740.

      **B.**    **Defendant's Argument**

The United States argues that summary judgment is appropriate because Plaintiffs have offered insufficient expert evidence to support their claim, and because Plaintiffs cannot establish that any person who provided Papa treatment violated the applicable standard of care in a way that caused the injury to the tongue.  Defendant has provided an expert report that contends that Defendant's agents did not breach the standard of care in treating Papa, and Defendant contends that Plaintiffs have failed to rebut this testimony with proper expert opinion. The United States argues that Plaintiffs' expert testimony is not admissible as an expert opinion because that opinion is merely speculative or conjectural and was actually written by Plaintiffs' attorney.  Defendant points out that Plaintiffs' expert on the intubation disclaimed many of the conclusions in his expert report during his deposition testimony and denied that many of the failings identified in his report had occurred or represented a failure to meet the standard of care for intubating a patient.  Even if his report were admissible, Defendant claims, Irwin's conclusions are insufficient to rebut Defendant's expert.

### C.    Plaintiffs' Response

Plaintiffs first contend that the Defendant has not satisfied its burden to introduce evidence that rebuts the claim of medical malpractice.  Plaintiffs argue that Defendant's expert opinion is contradicted by the medical records and therefore fails to meet Defendant's burden of proof.  Plaintiffs argue that the Defendant fails to meet the standard of proof because:

> the expert's opinion that the injury was unlikely to have occurred during the intubation, that it was possible that the tube caused an injury, and finally, that the mechanism of the decedent's injury is not clear from the medical record.  The expert's uncertainty, it is respectfully submitted, is a basis to deny the defendant's motion.

13

Plaintiffs insist that Defendant's expert opinion is not supported by the medical record because the expert concludes that the injury to the tongue likely did not occur during intubation.  Plaintiffs contend that the records clearly demonstrate an injury from the intubation.  As such, they contend, the Court must deny the Defendant's motion for failure to meet the burden of proof.  Plaintiffs also argue that a factfinder could conclude that negligence must have caused Papa's tongue injury based on the doctrine of *res ipsa loquitur*, since it may have been reasonable to conclude that no other source than negligence caused Papa's injury.

### D.   Expert Reports

The expert reports and testimony are largely determinative here.  The Court will therefore offer a summary of each, beginning with the Defendant's expert.

### i.   Defendant's Expert

Defendant offers the expert report of Vivek K. Moitra, MD.  See dkt. # 47-5.  Dr. Moitra is a board-certified anesthesiologist practicing in that field for nineteen years.  Id. at 1.  He is board certified in critical care medicine and neurocritical care.  Id.  Dr. Moitra "passed the National Board of Echocardiography's Examination of Special Competence in Advanced Perioperative Transesophageal Echocardiography and the Examination of Special Competence in Critical Care Echocardiography.  Id.  Moitra serves as Division Chief for Critical Care Medicine and the Co-Director of the Surgical Intensive Care Unit at the Columbia University Medical Center.  Id.  A Professor of Anesthesiology, he serves as a question writer and oral board examiner for the American Board of Anesthesiology.  Id.  Moitra relates that "I am familiar with the standards of care for anesthesiolgoy and critical

14

care that existed in the United States in 2015." Id.  His report focuses on Plaintiffs' expert's

claim that Defendant's agents breached the standard of care and injured Papa's tongue.  Id.

at 2.  Still, Moitra's examination of the medical records for Papa's hospitalization revealed

that "the entire course of treatment was appropriate and within the standard of care."  Id.

Dr. Moitra describes the course of Papa's treatment after he arrived in the

emergency room on July 22, 2015.  Id. at 2.  Papa's condition mandated "placement of a

breathing tube (intubation) and initiation of mechanical ventilation."  Id.  He received "a

sedative to render him unaware of the procedure and to relax the oropharyngeal muscles to

facilitate intubation."  Id.  The intubation came through "a video laryngoscope (Glidescope),

which is an instrument placed at the base and right side of the tongue to view the vocal

cords."  Id.  Intubation required only one attempt.  Id.  Dr. Moitra opines that "[t]his suggests

that the patient's mouth was open to facilitate complete visualization of the vocal cords, and

the procedure was an easy intubation."  Id.  Moreover, that situation "also suggests that

visualization of the vocals cords was not poor."  Id.  The medical notes describing the

procedure provide "that there were 'no complications during intubation.'"  Id.

Moitra relates that medical records from the Intensive Care Unit in the early morning

on July 23, 2015 contained a note that indicated that Papa was "not experiencing pain and

'appear[ed] to be comfortable at [that] time.'"  Id.  Dr. George Soryal's physical exam that

morning did not note any "oral lesions."  Id.  A nursing assessment at 6:52 p.m. on that day

"did not document a tongue bruise or hematoma."  Id.  Later, at 8:00 p.m., a nurse

documented a "bruised tongue."  Id.  During the time between the 6:52 check and the 8:00

check, 'the patient was receiving midazolam and fentanyl and described as sedated without

the ability to follow commands."  Id.  A July 24, 2015 nursing skin assessment noted

15

"bruising on Mr. Papa's arms and right hip, as well as a 'dark bruise on tongue.'" Id.  Dr.

Soryal, a nephrologist, noted later that day that Papa had "'a small hematoma' on the

tongue."  Id.  An otolaryngologist who saw Papa on July 30, 2015 found a 5cm x 3cm

eschar on the tip of his tongue.  Id.  Another examination on August 3, 2015 "noted that the

eschar appeared to be 'close to sloughing off' and that the tongue appeared otherwise

healthy."  Id.

Dr. Moitra offers an opinion on the causes of Papa's injury and whether any medical

malpractice occurred.  He opines that "[i]t is unlikely that the injury to the tongue occurred

during the intubation on July 22, 2015."  Id.  He finds that "the intubation was

uncomplicated, and successfully accomplished on one attempt."  Id.  Photos provided by

Papa's family make the injury inconsistent "with a bite injury" because that "injury . . .

extends down the center of the tongue, and appears to be in line with where the

endotracheal tube would lay."  Id. at 3.  The injury does not line up with the teeth, "as would

be typical for a tongue injury caused by biting during intubation."  Id.  Since Papa lacked

upper teeth, "biting down on the tongue, which is common in ICU patients, is an unlikely

mechanism of injury."  Id.  In addition, Dr. Moitra finds "[i]t is also unlikely that the injury to

the tongue was caused by the glidescope during the intubation procedure."  Id.  "During an

intubation," he opines, "the horizontal tip of the glidescope is placed above the epiglottis in

the velecula, an area much farther back on the tongue than the area of the injury to Mr.

Papa's tongue."  Id.  To cause the injury where the tongue was, the glidescope "would have

had to have been placed on the tip of the tongue," and "[t]his improper placement would

have resulted in poor visualization of the vocal cords, and likely would have complicated the

intubation."  Id.  A traumatic intubation would have led to "blood . . . in the area of the

trauma." Id.  The evidence, Moitra finds, indicates that the hematoma "developed between 6:52 and 8 p.m. on July 23, 2015, more than 24 hours after the intubation."

Dr. Moitra further opines:

The mechanism of Mr. Papa's hematoma is not clear from the record, but similar occurrences are observed in critically ill patients for a variety of reasons.  As a result of his critical illness and liver failure, Mr. Papa experienced coagulopathy, a condition in which the blood's ability to clot is impaired.  This condition predisposed him to easy bruising, bleeding, and hypotension requiring vasopressors–which in turn predisposed him to tissue breakdown on the tongue.  Notably, bruising was also documented on his left abodomen, both arms, and right hip, all of which is consistent with his critical illness.

It is also possible that the enotrachael tube caused a compression injury to the tongue during a period of agitation.  Mr. Papa's active medication list on July 23, 2015 included propofol and fentanyl.  Both of these medications are commonly used in the intensive care unit to manage anxiety, pain, and agitation, which are common symptoms of critical illness and commonly experienced during mechanical ventilation.  Later that day, he was transitioned from proppofol to midazolam, another sedative used to manage anxiety and agitation in the ICU.  The pressure of the endotracheal tube against Mr. Papa's tongue during a period of agitation, combined with his predisposure to bleeding and bruising, is a likely cause of the injury to Mr. Papa's tongue.

Id.  Dr. Moitra concludes that "[t]here is no evidence in the medical record, or anything else I have reviewed, that the injury to Mr. Papa's tongue was caused by negligence on the part of" Defendant's agents.  Id. at 4.  According to Dr. Moitra, providers at the Albany VA Medical Center "met the applicable standards in the care and treatment of Joseph Papa." Id.

### ii.    Plaintiffs' Expert Report

Plaintiffs provide the expert report of Robert W. Irwin, M.D.  See dkt. # 51-3.  Dr. Irwin begins his report by opining that the Albany VA Medical Center's treatment of Joseph Papa "deviated from acceptable standards of care during and while providing medical care and treatment[.]"  Id. at 1.  He further contends that "the deviations proximately caused

significant pain, discomfort and physical suffering prior to decedent's death." Id.  These

opinions, he writes, "are based upon my familiarity with the practice of medicine, my

knowledge, education, experience and a review of the available medical records." Id.  He

relates that his opinion comes from "an examination and review of" Papa's "medical records

and reports" as well as "the testimony of the parties and the pleadings in this action, my

education and experience, including my review and familiarity with authoritative manuals

and treatises in this area of medicine." Id. at 2.

Dr. Irwin describes the course of Papa's treatment. Id. at 3-4.  He writes that "the

decedent was intubated on or about July 23, 2015, with the records being somewhat

equivocal as to intubation and attempts at intubation." Id. at 3.  Irwin notes that Papa

received pain medication and sedatives at that time, and concludes "that pain medications

were being administered because of the presence and onset of pain." Id. at 4.  He further

relates that "[o]n or about July 24, 2015, it was discovered that a portion of the decedent's

tongue was missing and necrosis was occurring." Id.  Moreover, Irwin finds, the medical

records fail to confirm "the actual intubation process or equipment used, whether an

attending or resident physician may have performed the intubation, whether complications

arose or any other significant considerations[.]" Id.  He finds, however, that "the decedent

suffered trauma to his tongue during the intubation." Id.

Though Irwin admits that he did not review deposition testimony or have

"confirmation from the health care providers" about what equipment they used "during the

intubation process, the medical records that I reviewed and the factual history provided by

the family lead me to believe that the decedent bit down on his tongue during a time of

significant discomfort during the intubation process." Id.  Physicians' use of pain

18

medications to treat Papa and "a description of the decedent's physical and mental condition, including his inability to communicate," are "relat[ed] to the trauma experience relative to the decedent's tongue." Id.

Irwin reports that, if health care providers follow the proper standard of care during an intubation, "trauma to the tongue to the extent to the loss of tissue, is not expected or a recognized risk, nor should it occur under normal, reasonable and appropriate conditions." Id. An injury of the type Papa suffered should not occur "absent truly emergent circumstances." Id.

Irwin finds that Defendant's agents' treatment of Papa fell below the standard of care. Id. at 4. He writes that:

> The patient's overall condition should have been appropriately considered prior to the July 23, 2015 intubation. The necessity for intubation should have been considered in reference to the likelihood of success and benefit of intubation and the risks associated with not intubating the patient. Under the existing circumstances, the patient should have been appropriately prepared, positioned, sedated and prepped for intubation. Subject to continuing discovery and an understanding through testimony as to how the intubation actually occurred, I am prepared to testify regarding the manner by which one or more agents or representatives of the Albany VA Hospital performed the intubation procedure, the apparent failure to properly place equipment . . .[6] the consequences of such failure in combination with the intubation, and the management of the trauma caused, both at the time of the intubation and during the remaining period of hospitalization. In my professional opinion, with a reasonable degree of medical certainty, the aforementioned care and treatment, as stated above, deviated from appropriate standards of care and said deviation was the proximate cause of the patient's injuries, deterioration, pain and suffering. With the same reservations and conditions set forth above, I am prepared to testify that representatives of the Albany VA Hospital failed to adequately consider the history and physical condition of the patient prior to and at the time of the intubation, as well as to consider the full extent of the risks inherent in the care and treatment provided prior to administering such care and treatment.

---

[6] In the copy of the report provided the Court the words "including a properly sized bite block" are crossed out.

Id.  Irwin promises to testify on the standards of care, how Defendant breached the standard of care, and how that breach caused Papa's injuries.  Id.

### E.    Analysis of the Parties' Positions

The parties first disagree about whether Dr. Moitra's opinion meets the Defendant's burden in this respect.  "The elements of a medical malpractice cause of action are 'that the physician deviated or departed from community standards of practice, and that such departure was a proximate cause of the plaintiff's injuries.'" Smith v. Sommer, 189 A.D.3d 906, 907 (2d Dept. 2020) (quoting Stukas v. Streiter, 83 A.D.3d 18, 23 (2d Dept. 2011)).  "A defendant moving for summary judgment in a medical malpractice action must demonstrate the absence of any triable issues of fact with respect to at least one of those elements."  Id. (internal citations omitted).  If the defendant "makes a prima facie showing as to both elements, 'the burden shifts to the plaintiff to rebut the defendant's showing by raising a triable issue of fact as to both the departure element *and* the causation element.'" Id. (quoting Stukas, 83 A.D.3d at 25) (emphasis added in original)).  If the defendant offers a prima facie showing on only one of the elements of medical malpractice, a plaintiff need only show that an issue of fact exists for that element.  Mann v. Okere, 195 A.D.3d 910, 911 (2d Dept. 2021).  Normally, in New York, "[c]onflicting expert affidavits raise issues of fact and credibility that cannot be resolved on a motion for summary judgment."  Bradley v. Soundview Healthcenter, 4 A.D.3d 194, 194 (1st Dept. 2004).

### i.    Does Defendant Meet its Burden with Dr. Moitra's Report?

The first question for the Court, then, is whether Defendant has made a prima facie showing that Defendant did not deviate from the standard of care and that Papa's injuries were not caused by negligence.  Expert testimony that the treatment provided fell within the

relevant standard of care is sufficient to meet a defendant's prima facie burden on the first

element of a malpractice claim.  Harris v. Saint Joseph's Med. Ctr., 128 A.D.3d 1010, 1012

(2d Dept. 2015).  Prima facie evidence that a defendant's conduct was not the proximate

cause of a plaintiff's injuries requires more than a mere allegation: "'[b]are conclusory

assertions . . . with no factual relationship to the alleged injury' are insufficient to 'establish

the cause of action has no merit so as to entitle defendant[] to summary judgment.'"

Pullman v. Silverman, 28 N.Y.3d 1060, 1062 (N.Y. 2016) (quoting Winegrad v. New York

Univ. Med. Ctr., 64 N.Y.2d 851, 853 (N.Y. 1985)).

Plaintiffs contend that Dr. Moitra's report fails to make out a prima facie case in

support of Defendant's position that no medical malpractice occurred and the burden should

not shift to the Plaintiff to produce evidence to challenge Defendant's expert.  In challenging

Dr. Moitra's opinion that the evidence does not show that the tongue injury was the result of

the intubation, Plaintiffs point to three pages from the medical records.  The first of these

records comes from an otolaryncology consult by Dr. Stuart H. Curtis from July 30, 2015.

See dkt. # 58 at GOV 3824.  The record lists the "chief complaint" as "laryngeal edema and

necrotic tongue."  Id.  The record notes that Papa had been intubated on July 22, 2015.  Id.

The record further reports that "Patient had attempted extubation on July 29th however due

to low tidal volumes and desaturation the patient was intubated after several attempts."  Id.

The purpose of the consult on July 30, 2015 was "evaluation of laryngeal edema and

necrotic tongue s/p biting during initial intubation."  Id.  Papa was unable to participate in the

exam because of his intubation and sedation.  Id.  The second record cited by the Plaintiffs

contains the same information, recorded on the same day by the same examiner.  See

dkt.# 58 at GOV 2784.  The third record, made on July 31, 2015, notes that Joseph Papa

21

suffered from respiratory failure and necrotic tongue eschar.  See dkt. # 58 at GOV 2754.
The record further provides that "[t]here is an approximately 5x3cm black eschar on the tip
of the tongue extending left and posterior.  It is dry, the remainder of the tongue and oral
cavity is moist."  Id.  The government points out that the record from July 30, 2015 is the
only record in the 6000 pages of medical records in this matter that contains any claim that
Papa bit his tongue during intubation.  The statement in that record is in the history section
of the record and was not the result of any observation of the intubation. Plaintiffs' own
expert denied that the injury came from biting during intubation.

Plaintiffs also argue that Dr. Moitra's report fails to meet the Defendant's burden
because Dr. Moitra offers several possibilities for the cause of Papa's tongue injury, thus
creating a question of fact about that cause.  The government responds that the expert
report makes out a prima facie case that treatment did not violate the standard of care and
that his speculation about the cause of the tongue injury was in response to Dr. Irwin's
report, not a failing in his original report.

The Court finds that Dr. Moitra's report meets the Defendant's burden to present a
prima facie case that no medical malpractice occurred.  Plaintiffs do not challenge Dr.
Moitra's qualifications to testify in this matter.  The Court finds they could not, as Dr. Moitra
has the relevant education, training, and experience to testify about the process of
intubation, the standard of care for such procedures, and the likelihood that a breach of the
standard of care would cause a particular injury.  As explained above, Dr. Moitra examined
the relevant medical records and concluded that medical professionals followed the proper
standard of care when they intubated Mr. Papa.  The records, Dr. Moitra finds, indicate that
practitioners used proper equipment and a proper technique in the intubation, and that they

reported no unusual events or complications during the procedure.  As to the standard of care, then, Dr. Moitra's report makes out a prima facie case that no malpractice occurred. Plaintiffs' argument does not really address this conclusion, and by itself this finding would be sufficient to meet the Defendant's burden in this respect.  Dr. Moitra's report also reaches the conclusion that the intubation itself was not the cause of Papa's tongue injury. He offers several other possible causes of that injury, but finds that no evidence indicates that the tongue injury occurred at the time of the intubation.  Dr. Moitra does not merely speculate on this opinion, but points to the medical record for support, including notations in the record about the type of tongue injury, Papa's lack of teeth, and the date when the injury first occurred to support his position.  The Court concludes that Moitra's report meets Defendant's burden to show that, assuming a breach of the standard of care occurred, such a breach was not the proximate cause of Papa's tongue injury.

### ii.    Does Dr. Irwin's Report Meet the Plaintiffs' Burden?

Once the Defendant doctor makes a prima facie showing that the doctor did not breach the standard of care and/or that any injuries did not come from negligence, the plaintiff "must submit evidentiary facts or materials to rebut the prima facie showing[.]" Alvarez v. Prospect Hosp., 68 N.Y.2d 320, 324 (N.Y. 1986).  "General allegations of medical malpractice, merely conclusory and unsupported by competent evidence tending to establish the essential elements of medical malpractice, are insufficient to defeat defendant physician's summary judgment motion."  Id. at 325.  An expert opinion that "is speculative and without basis in the record" is "insufficient to raise a triable issue of fact." Spiegel v. Beth Israel Med. Center-Kings Hwy. Div., 149 A.D.3d 1127, 1129 (2d Dept. 2017).  Such an expert opinion must "respond to relevant issues raised by the defendants'

23

experts." <u>Ahmed v. Pannone</u>, 116 A.D.3d 802, 806 (2d Dept. 2014).  "'In order not to be

considered speculative or conclusory, expert opinions in opposition should address specific

assertions made by the movant's experts, setting forth an explanation of the reasoning and

relying on 'specifically cited evidence in the record.'" <u>Lowe v. Japal</u>, 170 A.D.3d 701, 703

(2d Dept. 2019) (quoting <u>Tsitrin v. New York Community Hosp.</u>, 154 A.d.3d 994, 996 (2d

Dept. 2017)); <u>see also</u>, <u>Feuer v. Ng</u>, 136 A.D.3d 704, 707 (2d Dept. 2016) (plaintiff failed to

meet her burden because her expert's "affidavit was conclusory and speculative on the

issue of proximate cause, and failed to address the specific assertions made by

[defendant's] expert.").

Defendant argues that Dr. Irwin's testimony is inadmissible and cannot rebut Dr.

Motira's report.  Federal Rule of Evidence 702 "governs the admissibility of expert

testimony." <u>Showers v. Pfizer, Inc.</u>, 819 F.3d 642, 658 (2d Cir. 2016).  That Rule permits

"[a] witness who is qualified as an expert by knowledge, skill, experience, training or

education" to "testify in the form of an opinion" under certain conditions.  FED. R. EVID. 702.

To be qualified to testify, the "expert's scientific, technical, or other specialized knowledge"

must "help the trier of fact to understand the evidence or to determine a fact in issue."  FED.

R. EVID.  702(a).  In addition, "the testimony" must be "based on sufficient facts and data"

and be "the product of reliable principles and methods."  FED. R. EVID. 702(b)-(c).  Finally,

the expert must have "reliably applied the principles and methods to the facts of the case."

FED. R. EVID. 702(d).  "The proponent of the testimony has the burden to establish these

admissibility requirements."  <u>Showers</u>, 819 F.3d at 642.

A district court has "broad discretion" in evaluating expert testimony.   <u>McCullock v.</u>

<u>H.B. Fuller Co.</u>, 61 F.3d 1038, 1042 (2d Cir. 1995).  In carrying out its role as gatekeeper, a

court must take a "flexible" approach that focuses on "the scientific validity–and thus the evidentiary relevance and reliability–of the principles that underlie a proposed submission." Daubert v. Merrell Dow Pharms., 509 U.S. 579, 594-95 (1993).  The court is to concentrate only on "principles and methodology," and "not on the conclusions that they generate."  Id. at 595.  Of course, "the types of factors to consider" in evaluating expert testimony "will 'depend upon the particular circumstances of the particular case at issue[.]'" Showers, 819 F.3d at 658 (quoting Kumho Tire Co. v. Carmichael, 526 U.S. 137, 150 (1999)).  The trial court's role is as "'gatekeeper," making sure "that the 'expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" Id. (quoting United States v. Williams, 506 F.3d 151, 160 (2d Cir. 2007)).  "It is a well-accepted principle that Rule 702 embodies a liberal standard of admissibility for expert opinions[.]"  Nimely v. City of New York, 414 F.3d 381, 395 (2d Cir. 2005).  In determining whether the expert has the qualifications to testify, the court's role, "whether a witness's area of expertise was technical, scientific, or more generally 'experienced-based," is to "'[make] certain that the expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  Id. at 396.

Once a court determines that an expert is qualified to testify, "Rule 702 imposes on the trial judge an obligation to determine whether the expert's specialized knowledge will assist the trier of fact, i.e., will be not only relevant, but reliable."  United States v. Romano, 794 F.3d 317, 330 (2d Cir. 2015).  "Expert testimony should be excluded where it is 'speculative or conjectural,' but arguments that the expert's assumptions 'are unfounded go to the weight, not the admissibility, of expert testimony.'"  Robinson v. Suffolk County

Police Dep't, 544 Fed. Appx. 29, 32 (2d Cir. 2013) (quoting Boucher v. U.S. Suzuki Motor

Corp., 73 F.3d 18, 21 (2d Cir. 1996)).  In determining whether expert testimony will assist

the trier of fact, a court must be careful to remember that such testimony may not either

"'usurp the role of the trial judge in instructing the jury as to the applicable law or the role of

the jury in applying that law to the facts before it[.]'"  Nimely, 414 F.3d at 397 (quoting

United States v. Blizerian, 926 F.2d 1285, 1294 (2d Cir. 1991).  The testimony should not

attempt to "'tell the jury what result to reach'" or "'substitute the expert's judgment for the

jury's.'"  Id. (quoting United States v. Duncan, 42 F.3d 97, 101 (2d Cir. 1994)).

Defendant does not contend that Dr. Irwin lacks the qualifications to testify.

Defendant instead argues that the report is not admissible because Irwin's testimony is

unreliable for a number of other reasons.

First, Defendant argues that the Court should exclude the report because counsel,

not Irwin, offered the report.  Defendant points to Federal Rule of Civil Procedure

26(a)(2)(B).  That rule governs the disclosure of expert testimony and provides that

"[u]nless otherwise stipulated or ordered by the court, this disclosure must be accompanied

by a written report–prepared and signed by the witness–if the witness is one retained or

specially employed to provide expert testimony in the case[.]" Fed. R. Civ. P. 26(a)(2)(B).

Courts have concluded that "'[p]reparing the expert's opinion from whole cloth and then

asking the expert to sign it if he or she wishes to adopt it conflicts with Rule 26(a)(2)(B)'s

requirement that the expert 'prepare the report.'  Preparation implies involvement other

than perusing a report drafted by someone else and signing one's name at the bottom to

signify agreement.'"  Trigon Ins. Co. v. United States, 204 F.R.D. 277, 293 (E.D. Va. 2001)

(quoting Manning v. Crockett, 1999 U.S. Dist LEXIS 7966, 1999 WL 342715, at *2-3 (N.D.

Ill. 1999)).  "The party seeking to strike an expert's testimony has the burden of proving that the report was 'ghost written.'"  Long Term Capital Holdings v. United States, No. 01-CV-1290 (JBA), 2003 U.S. Dist. LEXIS 14579 at *4 (D.Conn. May 6, 2003)

At the same time, courts have determined "that as long as the substance of the opinions is from the expert, the attorney's involvement in the written expression of those opinions does not make them inadmissible."  Seitz v. Envirotech Sys. Worldwide, Inc., 2008 U.S.Dist. LEXIS 17395 at *4 (S.D. Tx. Mar. 6, 2008) (citing Manning v. Crockett, No. 95 C 3117, 1999 U.S. Dist. LEXIS 7966, 1999 WL 342715, at *3 (N.D. Ill., May 18, 1999); Trigon Ins. Co., 204 F.R.D. at 293)).  Such courts have pointed to the statements related to the 1993 amendments to Rule 26(a)(2)(B), which provides that the Rule "does not preclude counsel from providing assistance to experts in preparing the reports, and indeed, with experts such as automobile mechanics, this assistance may be needed."  FED. R. CIV. P. 26.  Notes to 1993 Amendments.  The note emphasizes, however, that "the report, which is intended to set forth the substance of the direct examination, should be written in a manner that reflects the testimony to be given by the witness and it must be signed by the witness." Id.

Irvin's deposition testimony helps to answer the question of whether the report is unreliable and inadmissible because Plaintiffs' counsel prepared the report.  See Deposition Transcript of Robert Irwin ("T."), dkt. # 51-2.  That testimony calls into doubt whether the report reflects Irwin's actual opinion; Irwin himself disclaims many of the conclusions in the report.  The Court will relate relevant parts here.

During the deposition, Defendant's counsel showed Irwin a copy of his report.  The following colloquy then occurred:

Q. This is a report you drafted for the Papa case on or about December 17th of 2020; is that accurate?

A. Actually the words are not all mine.  It was in conjunction with the attorneys. So I actually asked them to do whatever was necessary in legal terms to write what was necessary but the content is—represents my opinion.

Q. Do you have a sense as to what percentage of the report was your words versus the attorney's words?

A. They wrote it based on my input.

Q. Did you make any changes to what they wrote?

A. Only what I crossed out, including a properly sized tongue blade–tongue block.

Q. You're referring to, on page 4 there, it says "including a properly sized bite block"?  The text is crossed out in what appears to be pen.  That's a change you made to the report that was written by the attorney?

A. Correct.

Q. Okay.  And is that the only change that you made to the draft they provided?

A. Yes.

Q. Okay.  Why did you cross out that language?

A. My opinion is that the damage to the tongue more than likely occurred from a complication of the intubation.  And I'm just going to read that correctly.  Then I can make it not ambiguous.

I am prepared to testify regarding the manner by which one or more agents or representative of the Albany VA performed the intubation procedure, the apparent failure to properly place equipment.

So in my opinion there was an injury to the tongue.  So there–the equipment, which is–which would be the larynygoscope, damaged the tongue.  So that would be the meaning of properly place equipment.

It says: And the management of the trauma caused, both at the time of the intubation and during the remaining period of hospitalization.  I would amend that the–my claim is that the procedure, the intubation procedure caused the tongue damage pretty much.  That's it. There was no–I don't have any criticism of the management.

T. at 27-29.  Dr. Irwin also confirmed that the only claim of malpractice he addressed was "the injury to Mr. Papa's tongue."  Id. at 29.

Defense counsel later asked Irwin to clarify the nature of his malpractice findings:

Q. Okay.  So is it your opinion that one or more providers at the Albany VA Medical Center deviated from the standard of care in–during the intubation of Mr. Papa?

A. It would have been just one practitioner performing the intubation which resulted in the tongue damage.

Q. Okay.

A.      Whoever that was.

Q.      Do you know what practitioner that was?

A.      No.

Q.      Okay.  But it was whatever provider it was who performed the intubation.

A.      Right.

Q.      What was the deviation from the standard of care?

A.      Damaging the tongue.

Q.      What was the mechanism of injury to the tongue?

A.      Tongue blade.  The laryngoscope.

Q.      The laryngoscope.  And how do you know that it was the laryngoscope that caused the injury to the tongue?

A.      It's my opinion on the face of it, prima facie, that the tongue was injured after the intubation.  The medical records confirm that or state that; that it was during the intubation that the tongue was damaged, and in my opinion, more than likely there isn't anything else that could reasonably explain that damage to the tongue besides the laryngoscope and the way it was utilized.

Id. at 32-33.  Irwin confirmed that he did not believe that Papa bit his tongue during

intubation.  Id. at 37.  Images of the tongue supported this understanding.  Id.

Later in the deposition, Defense counsel asked Irwin about breaches of the standard

of care claimed in his report:

Q.      Continuing on page 3 of your report under the heading Standard of Care, the first sentence talks about the standard of care for intubation, and I just want to bring your attention to–I'll highlight the language in a second.
The applicable standards of care are well-known and recognized and include procedure assessments, proper placement of the patient, proper administration of sedation and other medications as may be warranted and necessary.  Okay.
Do you agree with all of that in terms of what's the standard of care of intubation?

A.      That's good.  That part is good.

Q.      Is there any evidence to you that preprocedure assessment was not proper in this case?

A.      No.

Q.      I'm sorry I couldn't hear you.

A.      There was nothing improper about that.

Q.      Okay.  Thank you.  Was there anything improper about the placement of the patient?

A.      No.

Q.      Was there anything improper about the administration of sedation and other medications as may be warranted and necessary?

A.    No, not that I'm aware of.

Q.    Then we have "the use of proper and properly sized equipment including bite raisers, wedges, or other bite prevention devices."

A.    Let's forget about that part.  I want to cross that out, too, if I read it more carefully.

Q.    That's not part of the standard of care of intubating a patient in Mr. Papa's condition, correct?

A.    Right.

Q.    We have "sufficient staff and personnel"; is that accurate?

A.    Yes.

Q.    Is there any indication that there was insufficient staff or personnel for Mr. Papa's intubation?

A.    No.

Q.    "Acceptable technique," is that part of the standard of care for intubation?

A.    Yeah. Yeah.  That's the problem.

Q.    Okay.  All right.  There was–your opinion is that intubation or the provider who performed the intubation did not use an acceptable technique for the intubation; is that correct?

A.    On the face of it or there wouldn't be a tongue injury.

Q.    Okay.  So you don't know–is it fair to say that you don't know what it is that the provider did wrong, but they must have done something wrong; otherwise there would not have been a tongue injury; is that accurate?

A.    Well, my opinion is that they traumatized the tongue or there wouldn't be an injury.

Q.    Okay.  Do you have any sense as to what precisely the provider did wrong that caused the trauma to the tongue?

A.    With the–the laryngoscope damaged the tongue, more than likely, in my opinion.

Id. at 56-58.  Irwin also testified that he did not believe that Defendant's agents failed to consider the patient's condition before intubating him and that he agreed intubation was necessary.  Id. at 59-60.  When Defense counsel asked Irwin about a sentence in his report that stated "'[u]nder the existing circumstances, the patient should have been appropriately prepared, positioned, sedated, and prepped for intubation," Irwin responded: "I agree with whatever you were going to say.  Should eliminate that sentence as well."  Id. at 60.  He also agreed that medical staff managed the trauma to the tongue properly.  Id. at 62.

In the end, Dr. Iwrin agreed that, with reference to his report, it was:

fair to say that that is accurate only as it relates to the use of the laryngoscope during the intubation process and, in your opinion, the resultant injury to the tongue.

Id. at 65.

As evidence that the report was not prepared by Irvin, the Defendant points to the deposition testimony recited above. Defendant points out Irwin disclaimed the theory of liability contained in his report–that Mr. Papa bit his tongue during the intubation because the persons who performed the procedure did not use preventive devices like bite raisers, wedges or other bite prevention devices–during his deposition. The theory that Irvin offered at his deposition–that the physician who performed the intubation injured Papa's tongue with the laryngoscope during the intubation–did not appear in his report. Plaintiffs respond that the evidence indicates that "Dr. Irwin testified at his deposition as to his involvement with the Report and his execution fo the same." Plaintiffs further "[acknowledge] that many, if not most expert reports, are prepared with the assistance of legal counsel," and "respectfully [submit] that Dr. Irwin is both qualified and competent to testify and his Report admissible."

By itself, Dr. Irwin's report would seem to indicate that he has examined the medical record, applied his relevant knowledge to those facts, and determined that Defendant's agents breached the standard of care and that their breaches caused Papa's injuries. The case would become a battle of the experts and would require that a jury determine the facts.

Dr. Irwin's deposition testimony, however, indicates that he did little to prepare his report and does not agree with many of the conclusions represented therein. His

31

conclusion that Papa's injury occurred because of an improper use of the larynygoscope during the intubation bears little relation to most of the claimed malpractice in the report.  In that sense, most of the report is unreliable and, instead of containing the expert's evaluation of the situation, contains Plaintiffs' attorneys' legal theories.  A report where the expert repeatedly "crosses out" findings hardly has the reliability necessary to be considered an expert opinion.   The report appears to be drafted by an attorney to meet the demands of litigation, not prepared by Dr. Irwin as a summary of his findings.

The report, then, tips the Court towards a finding that the expert report is inadmissible and granting the Defendant's summary judgment motion.  Those failings do not push the Court all the way over towards a conclusion that the report is inadmissible, however.  A consistent argument for malpractice appears in both Dr. Irwin's report and in his testimony:  that Papa's injuries are consistent with an injury caused during the intubation process by improper use of the laryngoscope.  Reading Irwin's report's claim that Defendant's agents violated the standard of care in the way that they "placed" equipment in concert with his deposition testimony, the Court concludes that the report fits his testimony that improper use of the laryngoscope violated the standard of care and caused in a injury.  The Court is confident that contradictions in the report and deposition testimony, as well as Irwin's admissions about authorship of and flaws in his report, will provide extensive fodder for examination at trial.  The Court will not exclude the report on this basis.

Defendant next argues that, even in his deposition testimony, Dr. Irwin could not point to a specific cause for Papa's tongue injury.  Instead, he "assumed" that improper intubation caused that injury.  Defendant claims that this failing makes the report unreliable

and inadmissible.  Plaintiffs respond that the doctrine of *res ipsa loquitur* provides a basis

for factual issues that preclude a grant of summary judgment to Defendant.  "Under

appropriate circumstances, the evidentiary doctrine of res ipsa loquitur may be invoked to

allow the factfinder to infer negligence from the mere happening of an event."  States v.

Lourdes Hosp., 100 N.Y.2d 208, 211 (N.Y. 2003).  "To establish a prima facie case of

negligence in support of a res ipsa loquitur charge, [a] plaintiff must establish three

elements:

> "[1.] the event must be of the kind that ordinarily does not occur in the absence of
> someone's negligence;
> [2.] it must be caused by an agency or instrumentality within the exclusive control of
> the defendant; and
> [3.] it must not have been due to any voluntary action or contribution on the part of
> the plaintiff."

James v. Wormuth, 21 N.Y.3d 540, 546 (N.Y. 2013) (quoting Kambat v. St. Francis Hosp.,

89 N.Y.2d 489, 494 (N.Y. 1997)).  A plaintiff may establish that an injury would not normally

occur in the absence of negligence through the testimony of an expert.  States, 100 N.Y.2d

at 213-214.  Such testimony "may be properly used to help the jury 'bridge the gap'

between its own common knowledge, which does not encompass the specialized

knowledge and experience necessary to reach a conclusion that the occurrence would not

normally take place in the absence of negligence, and the common knowledge of

physicians, which does."  Id. at 212.  A "defendant must," however, "be given an opportunity

to rebut the assertion with competent expert evidence to show, for example, that the injury

complained of is an inherent risk of the procedure and not totally preventable with the

exercise of reasonable care."  Id. at 214.

Defendant responds that Dr. Moitra's evidence rebuts any assumption that the injury

Papa suffered could not have occurred without negligence by pointing to several possible causes for the injury.  The bruise that Papa suffered on his tongue, Defendant argues, constitutes a fairly common occurrence for a person as critically ill as Papa.  Moreover, Defendant contends, Plaintiff has not proved that the injury Papa suffered was caused by an instrumentality in Defendant's exclusive control.  Plaintiff has not identified the cause of Papa's injury in any more than a speculative way, and therefore Plaintiff cannot demonstrate the injury Papa suffered came from an instrumentality under Defendant's exclusive control.

The Court finds that Dr. Irwin's testimony provides evidence a reasonable juror could use to apply the doctrine of *res ipsa loquitur* and find that medical malpractice occurred during the intubation.  As explained above, Dr. Irwin testified that the sort of injury Papa suffered does not normally occur in the absence of negligence.  Knowledge of the intubation procedure, the devices involved, and the risks from such devices is the type of knowledge that an expert must provide.  Moreover, while Irwin testified that he did not know the identity of the doctor who performed the intubation, a reasonable juror could find that the device that caused the injury–presumably the laryngoscope–was under the exclusive control of Albany VAMC's staff.  Papa was under the care of the hospital at the time in question, and Irwin testified that the injury came from the use of a medical device that the medical records indicate was part of the procedure in question.  No evidence points to any voluntary conduct on the Decedent's part that would have caused the injury.

The Court must therefore find that a question of fact exists as to whether the Defendant's agents breached the standard of care during the intubation, causing the Decedent injury.  The Court will therefore deny the Defendant's motion for summary

34

judgment.

## IV.   CONCLUSION

For the reasons stated above, the Defendant's motion for summary judgment, dkt. #

47, is hereby DENIED.

**IT IS SO ORDERED.**

Dated: November 30, 2021

Thomas J. McAvoy
Senior, U.S. District Judge