**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**MATTHEW PAPA,** *as Co-Administrators of the Estate*
*of Joseph A. Papa, and Emma Papa*; and
**ELIZABETH REUSSWIG,** *as Co-Administrators of the*
*Estate of Joseph A. Papa, and Emma Papa,*

**Plaintiffs,**

vs.                                                    **1:17-CV-898**
                                                       **(MAD/CFH)**

**UNITED STATES OF AMERICA,**

**Defendant.**

_____

**APPEARANCES:**                              **OF COUNSEL:**

**BRENNAN, WHITE LAW FIRM**                   **WILLIAM J. WHITE, ESQ.**
163 Haviland Road
Queensbury, New York 12804
Attorneys for Plaintiffs

**OFFICE OF THE UNITED**                      **CATHLEEN B. CLARK, AUSA**
**STATES ATTORNEY – ALBANY**                  **KAREN FOLSTER LESPERANCE, AUSA**
James T. Foley U.S. Courthouse
445 Broadway, Room 218
Albany, New York 12207-2924
Attorneys for Defendant

**Mae A. D'Agostino, U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**I. INTRODUCTION**

On August 16, 2017, Plaintiffs Matthew Papa and Elizabeth Reusswig filed a complaint

alleging various medical malpractice claims arising out of the hospitalization of the decedent,

1

Joseph Alfred Papa ("Mr. Papa") at the Albany Veterans Affairs Medical Center ("Albany VA").[1] *See* Dkt. No. 1.  The Court held a bench trial on March 27, 2023, and March 28, 2023.  At trial, the only remaining claim was for medical malpractice arising out of Dr. Dianna Langdon's use of a GlideScope, a video laryngoscope, during Mr. Papa's intubation on July 22, 2015.  *See* Dkt. Nos. 59, 70; Pls.' Ex. 8.  Plaintiffs Matthew Joseph Papa and Elizabeth Marie Reusswig testified, and the parties stipulated to the admission of the transcript of videotaped testimony of Plaintiffs' expert witness Dr. Robert W. Irwin.  The Government called Dr. Langdon,[2] and expert witness Dr. Vivek Moitra, the division chief of critical care medicine at Columbia University Medical Center.

Having reviewed the parties' pre-trial submissions, the trial transcript and exhibits, and the parties post-trial briefs, the Court makes the following findings of fact and conclusions of law.

## II. FINDINGS OF FACT[3]

### A.    The Parties and Jurisdiction

1.  Plaintiff Matthew Joseph Papa is a resident of Albany, New York.  *See* Tr. 3/27 at 13.  He is Mr. Papa's son.  *See id.*

2.  Plaintiff Elizabeth Marie Reusswig is a resident of Pennsylvania.  *See id.* at 89.  She is Mr. Papa's daughter.  *See id.* at 13.

---

[1] On December 28, 2020, Emma Papa was terminated as a plaintiff from the action, and the claims specific to her relationship with Mr. Papa were dismissed.  *See* Dkt. No. 44; Dkt. No. 1 at ¶¶ 66-72.

[2] Dr. Langdon was a senior emergency medicine attending in July 2015, and is currently chief of the emergency department at the Albany VA.

[3] Prior to trial, the parties submitted a Joint Pre-Trial Stipulation, which contained certain stipulated jurisdictional and undisputed facts.  *See* Dkt. No. 71.  The Court's findings of fact are derived both from the parties' stipulated facts and the Court's findings based upon the trial transcript and exhibits.

3. Defendant United States of America owns and operates the Albany VA.

4. Plaintiffs sued the United States of America pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1346(b)(1).

**B.     Medical History**

5. Mr. Papa's medical history included: coronary artery disease, congestive heart failure, type II diabetes, hypertension, gastritis, nephrolithiasis, stage IIIa chronic kidney disease, chronic mycrocytic anemia, recurrent gastrointestinal bleeding, and chronic blood loss anemia, which required recurrent blood transfusions.  *See* Dkt. No. 71 at ¶ 18; Tr. 3/27 at 71.

6. Mr. Papa was treated in March 2015 at the Albany VA with blood transfusions and had "a couple periods" of inpatient hospital stays during the spring of 2015.  *See* Tr. 3/27 at 16-17, 48-49.

7. Mr. Papa did not have upper teeth.  *See* Dkt. No. 71 at ¶ 35.

8. Mr. Papa was not on dialysis prior to July 22, 2015.  *See* Tr. 3/27 at 47.

9. Mr. Papa was 86 years old on July 22, 2015.  *See* Dkt. No. 71 at ¶ 17.

**C.     Emergency Department ("ED") Arrival**

10. Plaintiff Matthew Papa testified that Mr. Papa's health on July 21, 2015, seemed "fine." *See* Tr. 3/27 at 18.

11. Elizabeth Reusswig described Mr. Papa's health as "pretty normal" in the week prior to July 22, 2015.  *See id.* at 48.

12. Plaintiff Elizabeth Reusswig spent July 22, 2015, with Mr. Papa, and had seen him roughly every day during the week prior.  During those visits, they would eat, and discuss and research assisted living centers for Mr. Papa and Emma Papa.  *See id.* at 47.

13. Mr. Papa and Plaintiff Reusswig had lunch together on July 22, 2015, and spent the afternoon together until 8:00 p.m.  Plaintiff Reusswig believed Mr. Papa seemed tired but otherwise normal.  *See id.* at 49.

14. At approximately 10:00 p.m. on July 22, 2015, Mr. Papa called Plaintiff Matthew Papa while Plaintiff Matthew Papa was with Plaintiff Reusswig.  Mr. Papa told Plaintiff Matthew Papa that he was not feeling well, and Plaintiff Matthew Papa testified that he picked up Mr. Papa and drove him to the Albany VA emergency department.  *See id.* at 18-19, 50.  Plaintiff Reusswig arrived at the hospital around an hour and a half later.  *See id.* at 50.

15. There is a discrepancy as to whether Mr. Papa arrived by ambulance or whether Plaintiff Matthew Papa drove him.  *Compare* Dkt. No. 71 ¶ 18 *with* Tr. 3/27 at 50.

16. Mr. Papa told Plaintiff Matthew Papa that he was experiencing chest pain and pressure.  *See* Tr. 3/27 at 18-19.

17. Mr. Papa arrived at the emergency department at approximately 11:06 p.m. and "complained of shortness of breath and mid-sternal chest pain."  Dkt. No. 71 at ¶¶ 16, 20.

18. Mr. Papa was placed on a cardiac monitor and a non-rebreather 100 percent facemask, received an EKG, two IV lines, and had blood drawn.  *See* Tr. 3/27 at 72.

19. Mr. Papa's oxygen saturation levels dropped to the mid-seventies while supplemental oxygen was being administered with a 100 percent oxygen non-rebreather mask.  *See* Dkt. No. 71 at ¶ 23; Tr. 3/28 at 15.

20. Mr. Papa's blood pressure was ninety-six over fifty-seven.  *See* Dkt. No. 71 at ¶ 21.

21. Mr. Papa was in critical condition from shock and acute respiratory failure, *see id.* at ¶ 24, and had a low oxygen saturation of eighty-five percent, an elevated respiratory rate of thirty-eight, rhonchi in his lungs, and labored breathing.  *See id*. at ¶ 22; Tr. 3/27 at 72-73.

22. A portable chest x-ray showed a pulmonary edema with bilateral pleural effusions and increased pulmonary vascular congestion.  *See* Dkt. No. 71 at ¶ 25.

**D.     Intubation**

23. At approximately 11:07 p.m. on July 22, 2015, Dr. Dianna Langdon, the attending physician for the department that evening, evaluated Mr. Papa.  *See id.* at ¶ 26; Tr. 3/27 at 69.

24. Dr. Langdon noted mottled skin and extremities and labored breathing.  Mr. Papa stated he was experiencing chest pain and other issues.  *See* Tr. 3/27 at 73.

25. Nursing staff and respiratory therapy staff were with Dr. Langdon at Mr. Papa's bedside. *See id.* at 72.

26. Dr. Langdon received a verbal consent for intubation and blood transfusion by medical proxy from Matthew Papa.  *See id.* at 98.

27. Plaintiffs waited in the waiting room.  *See id.* at 20.[4]

28. Due to an impending respiratory failure, Dr. Langdon performed an emergent intubation at 11:35 p.m.  *See* Dkt. No. 71 at ¶¶ 27-29; Tr. 3/27 at 87.

29. Dr. Langdon used a size eight cuffed, or an eight-millimeter, endotracheal ("ET") tube for the intubation.  *See* Tr. 3/27 at 82; Dkt. No. 71 at ¶¶ 38, 40.

---

[4] Initially, Emma Papa and Plaintiff Matthew Papa were the only family members at the hospital. After some time, Plaintiff Reusswig arrived.  *See id.* at 20-21.

5

30. Dr. Langdon intubated Mr. Papa with a GlideScope, which is a type of video laryngoscope.  *See* Dkt. No. 71 at ¶ 34.

31. GlideScopes have plastic handles used for intubation.  *See* Tr. 3/27 at 76.  In 2015, the GlideScope handle had a clear non-soft, or hard, plastic and had plastic covers to go over the camera.  *See id.* at 77, 81.  The plastic covers were disposable, while the camera portion was not.  *See id.* at 77.

32. The parties agree that the intubation was medically necessary.  *See* Dkt. No. 71 at ¶ 28.

33. The parties agree that the pre-procedure assessment was appropriate.  *See id.* at ¶ 30.

34. The parties agree that Mr. Papa was properly placed for the intubation procedure.  *See id.* at ¶ 31.

35. The parties agree that the pre-procedure medication was appropriate and necessary.  *See id.* at ¶ 32.

36. Dr. Langdon's intubation practice at the time included preparing the area with the patient's head at the top of the stretcher, with the chest elevated, and positioning the head for the best visualization for intubation.  Dr. Langdon would use a video laryngoscope and a standard intubation kit, including an ET tube with a syringe and a stylet.  The staff would prepare the equipment and medications, as well as preoxygenation.  The patient would then be sedated.  *See* Tr. 3/27 at 74-75.

37. Following that, Dr. Langdon testified that "[o]nce you have a patient positioned, you enter the oral pharynx with the blunted tip of the GlideScope handle.  You enter at the base of the tongue.  As the tip traverses the tongue, it lands into the vallecula.  And then once the tongue is cradled in the handle and seated in the vallecula, with an upward and outward, up towards the ceiling at a 45-degree angle, it is lifted, which lifts the entire tongue and

the vallecula where there is a hyoepiglottic ligament that pulls up the epiglottis so that you can have a clear view of the vocal cords.  Once you have a clear view of the vocal cords, you would take your ET tube and pass it with direct visualization through the vocal cords.  Once through the vocal cords, you would remove the handle and inflate the cuff.  You would use the Ambu bag to confirm—actually, sorry.  You would pass the vocal cords, the ET tube through the vocal cords.  You would remove the stylet.  You would inflate the balloon.  You would use a colorimetric meter and end-tidal CO2 to confirm detection of carbon dioxide.  Then you would inflate the lungs to note the bilateral rise of the chest wall and clear breath sounds and increasing oxygenation … Once the endotracheal tube has passed the vocal cords and you inflate the cuff, end-tidal CO2 again is checked for confirmation, and then you would inflate the lungs with the Ambu bag and confirm bilateral breath sounds and oxygenation elevation.  At this point, I would have RT secure the tube."  *Id.* at 84-85.

38. During the laryngoscopy for the intubation, Dr. Langdon used the Cormak-Lehane scaling system to classify the degree of visualization of the vocal cords.  *See* Dkt. No. 71 at ¶ 36.

39. Dr. Langdon classified her view of the vocal cords as Grade I on the Cormack-Lehane Scale.  *See id.* at ¶ 37.  She had complete visualization of the vocal cords.  Tr. 3/27 at 88.

40. Dr. Langdon completed the intubation on the first attempt.  *See* Dkt. No. 71 at ¶ 39.

41. The ET tube remained in place after Dr. Langdon inserted it.  *See id.* at ¶ 40.

42. There was a mouthpiece connected to the ET tube, which remained attached until a few days later.  *See* Tr. 3/27 at 52.

43. Uncomplicated intubations generally take ten-to-fifteen seconds to pass the ET tube. *See id.* at 85-86. The GlideScope in an uncomplicated intubation is in the oral cavity for approximately ten to fifteen seconds. *See id.* at 86.

44. The VA requires present staff members to make intubation notes for quality assurance, including notes of complications. *See id.* at 86, 88, 104. Dr. Langdon testified that if she subsequently learns of a complication she does not go back and amend or supplement the records. *See id.* at 103.

45. Dr. Langdon noted that the intubation did not have any complications. *See id.* at 88.

46. Generally during intubation, the GlideScope handle does not touch the tip of a patient's tongue. *See id.* at 86.

47. Dr. Langdon is not aware of any instances of a patient's tongue being injured by a plastic GlideScope during an intubation during her twenty-four-year career. *See id.* at 89.

48. After the intubation, Mr. Papa was connected to a ventilator, and his oxygen saturations were in the range of ninety-eight to one hundred percent. *See* Dkt. No. 71 at ¶ 41.

49. Dr. Langdon ordered a blood transfusion, which began at 11:45 p.m. *See id.* at ¶ 42.

50. By 12:29 a.m. on July 23, 2015, Mr. Papa's blood pressure dropped to seventy-nine over forty-seven. *See id.* at ¶ 43.

51. By 1:00 a.m. on July 23, 2015, Mr. Papa's blood pressure dropped to 65/37. *See id.* at ¶ 44.

52. An emergent central line was placed at approximately 2:30 a.m. on July 23, 2015. *See id.* at ¶ 45.

53. Mr. Papa was sedated and unarousable when the central line was placed. *See id.* at ¶ 46.

54. Mr. Papa was in the emergency department for a total of about two and a half hours and was then moved to the intensive care unit. *See id.* at ¶¶ 16, 47; Tr. 3/27 at 89.

**E.     Medical Intensive Care Unit**

55. At approximately 1:35 a.m. on July 23, 2015, Mr. Papa was admitted to the medical intensive care unit ("ICU") in critical condition. *See* Dkt. No. 71 at ¶¶ 47, 49; Tr. 3/27 at 89. The ET tube from intubation remained in his mouth. *See* Tr. 3/27 at 89.

56. Dr. Langdon was no longer Mr. Papa's physician upon admission to the ICU. *See* Dkt. No. 71 at ¶ 48.

57. Upon admission to the ICU, he was in critical condition and diagnosed with cardiogenic shock, respiratory failure, dropping hematocrit, acute chronic kidney injury, liver shock, metabolic acidosis, and hyperkalemia. *See* Dkt. No. 71 at ¶ 49.

58. Mr. Papa was also hemodynamically unstable, and his heart rate was documented in the thirties and low blood pressures, which required treatment with vasopressors. *See id.* at ¶ 50.

59. Plaintiff Matthew Papa, Emma Papa, and Plaintiff Reusswig were called to the ICU at approximately 2:00 a.m., where they were given the status of Mr. Papa's condition and saw him for a short amount of time. *See id.* at ¶ 51; Tr. 3/27 at 50. About an hour and a half later, the family saw Mr. Papa when he was stabilized, sedated, and intubated. *See* Tr. 3/27 at 51.

60. Mr. Papa was unconscious in the ICU when his family members were allowed to visit him. *See id.* at 23.

61. The family was informed that his prognosis was poor, *see* Dkt. No. 71 at ¶ 51, and
    Plaintiff Matthew Papa testified that a hospital representative told the family members that
    Mr. Papa would not likely survive. *See* Tr. 3/27 at 21.

62. Plaintiff Matthew Papa did not leave between July 22 and July 23, *see id.* at 29, spent the
    entirety of July 23, 2015, at the hospital, and most of that day with Mr. Papa. *See id.* at
    25.

63. Plaintiff Reusswig visited her father every day from his admission until the day before Mr.
    Papa's death for eight to twelve hours a day and would look at his tongue every day. *See
    id.* at 55.

64. Plaintiff Reusswig noted discoloration of Mr. Papa's tongue on the morning of July 23,
    2015, about six or seven hours after arriving at the hospital. She noted the top of his
    tongue was darkened and appeared to be scabbing, and Plaintiff Matthew Papa then
    noticed some black discoloration on the tongue. *See id.* at 26, 53.

65. At 12:33 p.m. on July 23, 2015, nephrologist Dr. George Soryal evaluated Mr. Papa and
    reported no oral lesions. *See* Dkt. No. 71 at ¶¶ 52-53.

66. On July 23, 2015, Dr. Stuart Curtis, an ENT ("ear, nose, throat") resident, told Plaintiff
    Matthew Papa that he believed Mr. Papa bit his tongue during intubation. *See* Tr. 3/27 at
    64.

67. Dr. Curtis was not present during the intubation. *See* Tr. 3/27 at 39.

68. The eschar at the tip of Mr. Papa's tongue is not consistent with a bite injury. *See* Dkt. No.
    71 at ¶ 62.

69. Matthew Papa testified that over the next few days "[t]here would be periods where he
    was—his heart rate would be going up very high. He'd be thrashing around in the bed

uncomfortably and moaning, making noises, but not conscious and speaking."  Tr. 3/27 at 26.

70. Mr. Papa indicated he was in pain by grimacing, nodding his head, and thrashing.  *See id.* at 55.

71. Plaintiff Matthew Papa noted that his father's tongue "looked bad" over the course of the hospital stay, and he witnessed nurses tending to it.  Matthew Papa explained that the tongue "continued to get worse, and it got darker and more black, and then parts of his tongue fell off."  *Id.* at 27-28.

72. On July 24, 2015, at 1:53 a.m., a nurse noted bruising on Mr. Papa's arms, abdomen, right hip, and tongue.  *See* Dkt. No. 71 at ¶ 54; Pls.' Ex. 2.23.

73. At 1:37 a.m. on July 25, 2015, Paulette Furdyna, a registered nurse, documented the following information on a "Pain Note": "Patient/resident has experienced the following recent painful procedures or events which may have caused pain or discomfort: intubation," and there was evidence of grimacing.  Dkt. No. 71 at ¶ 55.

74. On July 25, 2015, at 2:43 a.m., an ICU staff member described Mr. Papa's tongue in a note as "bruised and dry, slightly swollen."  *Id.* at ¶ 56; Pls.' Ex. 2.2.

75. On July 25, 2015, at 11:00 a.m., a resident noted a one-centimeter hematoma on the left side of Mr. Papa's tongue.  *See* Dkt. No. 71 at ¶ 58.  He was also noted as having bruising on both arms, his left abdomen, tongue, and right hip.  *See id.* at ¶ 59.

76. Mr. Papa was prescribed fentanyl.  *See id.* at ¶ 57.

77. On July 29, an attempt was made to extubate Mr. Papa, but due to swelling in the upper airway preventing his breathing, Mr. Papa was re-intubated that day.  *See id.* at ¶ 65.

78. On July 30, 2015, Dr. Curtis noted the presence of a five-by-three-centimeter black eschar on the tip of Mr. Papa's tongue that extended to the left and posterior area and did not have signs of infection. *See id.* at ¶¶ 60-61.

79. On August 3, 2015, Dr. Curtis noted that the eschar appeared "to be close to sloughing off" and the tongue otherwise appeared healthy. Dkt. No. 71 at ¶ 63.

80. Plaintiff Reusswig noticed the darkened area of the tongue became very black over the course of the hospital stay. The tongue skin would "slough off" and then approximately the front quarter of the tongue fell off. *See* Tr. 3/27 at 54.

81. On August 18, 2015, Dr. Curtis noted during a physical exam that Mr. Papa's tongue was "lacerated and necrotic." Dkt. No. 71 at ¶ 64.

82. During his hospitalization, Mr. Papa appeared agitated or tense, and his blood pressure and heart rate elevated, which Plaintiff Matthew Papa attributes to Mr. Papa being in pain. *See* Tr. 3/27 at 32.

83. During his hospitalization, Mr. Papa developed pulmonary emboli and necrosis of the kidneys which progressed to end stage renal disease and required treatment with dialysis. *See* Dkt. No. 71 at ¶ 66; Tr. 3/28 at 129, 139.

84. During his hospitalization, Mr. Papa was diagnosed with anemia, which required treatment with blood transfusions. *See id.* at ¶ 68.

85. Mr. Papa also developed liver failure related to shock. *See id.* at ¶ 69.

86. On August 31, 2015, upon the request of his family, Mr. Papa was removed from the ventilator and transitioned to palliative care. *See id.* at ¶ 70.

87. After extubation, Mr. Papa did not speak but did make noises. *See* Tr. 3/27 at 42.

88. Plaintiff Matthew Papa took approximately three pictures of Mr. Papa's tongue around the last week of August after Mr. Papa was extubated. *See id.* at 30, 33.

89. Mr. Papa could not speak between being intubated and his final extubation, but did communicate in other physical ways, such as by nodding. *See id.* at 30.

90. After his extubation, Mr. Papa was cognitive, and he would respond to questions by nodding, shaking his head, or moving his hands. Mr. Papa could not speak but attempted to do so. *See id.* at 57-58.

91. Mr. Papa was sedated on and off in August, *see id.* at 58, and was consciously awake approximately half of the time during August and the beginning of September. *See id.* at 59.

92. Nursing staff would switch the position of the ET tube. *See id.* at 31.

93. On September 3, 2015, Mr. Papa's mental status was documented as "awake." *See* Dkt. No. 71 at ¶ 71.

94. On September 4, 2015, a note in the medical record states Mr. Papa was "awake, alert, and seated upright in bed." *Id.* at ¶ 72.

95. On September 4, 2015, a speech-language pathologist documented that there was an "area of erosion of anterior 1/3 of tongue with patch of excoriation palate," but Mr. Papa could "generate some social speech," though it was intelligible. *Id.* at ¶¶ 73-74.

96. On September 4, 2015, Mr. Papa was prescribed fentanyl injections of "12.5 mcg/0.25 ml IV" every four hours for pain or agitation. *Id.* at ¶ 75.

97. A September 4, 2015, record documented that Mr. Papa had a perirectal skin ulcer. *Id.* at ¶ 76.

98. Mr. Papa died on September 8, 2015, while a patient at the Albany VA. *See id.* at ¶ 77.

**F.      Personal History**

99. Mr. Papa was the father of three children: Matthew Joseph Papa, a real estate broker,

Mark Papa, and Elizabeth Reusswig, a business consultant.

100. At the time of his death, Mr. Papa was married to Emma Papa, who now lives in an

assisted living center. *See* Tr. 3/27 at 13-14.

101. In the spring of 2015, Mr. Papa saw Plaintiff Matthew Papa approximately five or six

days per week. *See id.* at 16.

102. In the spring and summer of 2015, Plaintiff Elizabeth Reusswig saw Mr. Papa about once

or twice a month and saw him more often in July after Mr. Papa's hospitalization. *See id.*

at 46-47.

103. At the time of his death, Mr. Papa lived on New Scotland Avenue with Emma Papa. *See*

*id.* at 18-19.

104. Mr. Papa served as a marine in the Korean War. *See id.* at 14.

105. Mr. Papa worked various jobs throughout his life, including at Barnes & Noble, Coulson's

newsstand, and as an insurance seller. *See id.*

106. Mr. Papa did not have a will. *See id.* at 18.

### III. CONCLUSIONS OF LAW

**A.      Legal Standard**

"In a bench trial such as this, it is the Court's job to weigh the evidence, assess credibility,

and rule on the facts as they are presented." *Bahrami v. Ketabchi*, No. 05-CV-3829, 2009 WL

513790, *9 (S.D.N.Y. Feb. 27, 2009) (quoting *Johnson-McClean Techs. v. Millennium Info. Tech.*

*Grp.*, No. 02-CV-244, 2003 WL 192175, *8 (S.D.N.Y. Jan. 27, 2003) (internal quotation marks

and alterations omitted)); *see also Mathie v. Fries*, 121 F.3d 808, 811-12 (2d Cir. 1997).  "The

Court [is] 'in the best position to evaluate [each] witness's demeanor and tone of voice as well as other mannerisms that bear heavily on one's belief in what the witness says.'" *Bahrami*, 2009 WL 513790, at *9 (quoting *Donato v. Plainview–Old Bethpage Cent. Sch. Dist.*, 96 F.3d 623, 634 (2d Cir. 1996)); *see also Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985) (noting that "only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said"). If the "evidence is equally divided ... 'the party with the burden of proof loses.'" *Bahrami*, 2009 WL 513790, at *9 (quoting *United States v. Gigante*, 39 F.3d 42, 47 (2d Cir. 1994)); *see also Fulop v. Malev Hungarian Airlines*, 244 F. Supp. 2d 217, 223 (S.D.N.Y. 2003) (finding that "[t]he evidence on this issue is substantially divided and, in the Court's assessment, does not tilt sufficiently to Plaintiff's case to satisfy the preponderance standard").

**B.    Analysis**

The FTCA empowers the federal district courts with the "exclusive jurisdiction of civil actions on claims against the United States, for money damages, ... for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government …" 28 U.S.C. § 1346(b)(1). For there to be liability, the employee's act must have taken place "while acting within the scope of his [or her] office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." *See id.* The language, "the law of the place," means that the courts must apply "the whole law of the State" in which the alleged negligent acts occurred. *Richards v. United States*, 369 U.S. 1, 11 (1962).

"Under New York law, a medical malpractice plaintiff must prove '(1) that the defendant breached the standard of care in the community, and (2) that the breach proximately caused the

plaintiff's injuries.'" *Stelman v. United States*, No. 14-CV-5363, 2016 WL 5315196, *12

(S.D.N.Y. Sept. 21, 2016) (quoting *Arkin v. Gittleson*, 32 F.3d 658, 664 (2d Cir. 1994)).

Additionally, "'except as to matters within the ordinary experience and knowledge of laymen,' an

expert medical opinion 'is required to make out both of these elements.'" *Id.* (quoting *Milano v.*

*Freed*, 64 F.3d 91, 95 (2d Cir. 1995)).

      The Second Circuit has provided the following guidance regarding the standard of care:

> A physician's obligations to his patient are to possess at least the
> degree of knowledge and skill possessed by the average member of
> the medical profession in the community in which he practices, to
> exercise ordinary and reasonable care in the application of that
> professional knowledge and skill, and to use his best judgment in
> the application of his knowledge and skill.

*Sitts v. United States*, 811 F.2d 736, 740 (2d Cir. 1987).  As for the standard of care, Plaintiffs and

Defendant stipulated to the following: it was medically necessary to intubate Mr. Papa, *see* Dkt.

No. 71 at ¶ 28, the pre-procedure assessment was appropriate, *see id.* at ¶ 30, Mr. Papa was

properly placed for the intubation procedure, *see id.* at ¶ 31, and the pre-procedure medication

was appropriate.  *See id.* at ¶ 33.

      For Plaintiffs, Dr. Irwin, a retired pulmonologist, provided expert testimony.  *See* Pls.' Ex.

1.  Dr. Irwin has personally been present at, while watching or performing, hundreds of

intubations.  *See id.* at 13.  Dr. Irwin's report made in preparation for trial found that the "injury to

the tongue" was evidence of a deviation from the standard of care during intubation as there was

"no other bona fide explanation for the" resulting necrosis,[5] *id.* at 42; Tr. 3/28 at 29,[6] and that the

---

[5] Dr. Irwin explained that a bruise on tissue can take time to form, *see* Pls.' Ex. 1 at 44, and the
process of Mr. Papa's tongue injury was from hematoma, to forming an eschar, and then necrosis.
*See id.* at 43.

[6] Dr. Irwin's report contained several inaccuracies that he amended at his deposition.  *See* Pls.' Ex.
1 at 62-66.  Dr. Irwin also testified that he reviewed some records before completing his report
and some after, *see id.* at 60, and spent approximately one to two hours reviewing the record and

intubation process proximately caused the tongue injury.  *See* Pls.' Ex. 1 at 43.  Specifically, Dr. Irwin testified that it was "more likely than not" that the use of the GlideScope caused the tongue damage, *see id.* at 42, 52, and that "the negligence would have to do with the pressure from the GlideScope on the tongue."  *Id.* at 56.

Dr. Irwin testified that there was not any deviation from the standard of care in the preparation, position, or sedation of Mr. Papa, *see id.* at 58, that nothing was omitted from the process, *see id.* at 56-57, that the intubation was emergent, *see id.* at 15, and necessary, *see id.* at 18, and that the placement of the GlideScope was proper.  *See id.* at 50.[7]  Dr. Irwin testified that he was unaware of a patient suffering an injury from a laryngoscope during intubation.  *See id.* at 58-59.  Dr. Irwin stated that pressure from an ET tube can cause necrosis in a patient with shock, though he felt it was unlikely in this case.[8]  *See id.* at 95.  Dr. Irwin testified that a patient with coagulopathy can develop bruising on different parts of the body, *id.* at 97, and that Mr. Papa's other bruising on his abdomen and arms were not caused by medical malpractice or negligence, but rather was caused by other physiological issues.  *See id.* at 98.

During cross-examination, Dr. Irwin testified that Mr. Papa's blood pressure was consistent with shock, and though not discussed in his report, that Mr. Papa qualified for a diagnosis of shock.  *See* Pls.' Ex. 1 at 73.  He further testified that (1) shock causes reduced blood flow and reduced oxygen supply, *see id.* at 77; (2) an injury can occur when an organ's cells do not receive enough oxygen, *see id.* at 79; (3) lack of blood supply can cause necrosis, *see id.*; (4)

---

signing the report prepared by Plaintiffs' attorneys.  *See id.* at 61.  Dr. Irwin had not reviewed Dr. Langdon's intubation note when he signed the report and prepared for his deposition.  *See id.* at 68.  He did not know when the bruise developed when he testified at his deposition.  *See id.*

[7] Dr. Irwin testified that the later management of his tongue injury was proper.  *See id.* at 64.

[8] Dr. Irwin did not elaborate further on this cross-examination testimony as to why he formed the opinion that it was unlikely that the ET tube caused this injury.

shock can cause organ damage, *see id.* at 80; (5) Mr. Papa's kidneys were impaired and required

dialysis, *see id.* at 84; (6) shock contributed to injuries of the kidneys, *see id.* at 83-84; (7)

malpractice did not cause Mr. Papa's kidney injuries, *see id.* at 85; (8) shock contributed to Mr.

Papa's liver injury, *see id.* at 86; (9) liver disease can affect the body's ability to clot, and can

cause bleeding or bruising, *see id.*; and (10) vasopressors cause ischemia in extremities and skin

breakdown.  *See id.* at 88.

The Government's medical expert Dr. Vivek Moitra, the Division Chief of Critical Care

Medicine and the Co-Medical Director of the ICU at Columbia University Medical Center,

contradicted Dr. Irwin's original opinion of negligence being the only possible cause of Mr. Papa's

tongue necrosis.  *See* Tr. 3/28 at 114.  His opinion is based on his own experience, which includes

practicing anesthesiology for more than twenty years and performing thousands of intubations,

*see* Tr. 3/28 at 4, as well as the general knowledge of the medical community, and reviewing the

record.  *See id.* at 13, 24, 35-36.  Dr. Moitra testified that Dr. Langdon and the intubation

generally met the standard of care at the time of the procedure, including in the placement of the

ET tube.  *See id.* at 121.  He discussed that the typical

> process of using the video laryngoscope begins with the initiation
> and administration of medications … Once that state is reached, the
> clinician – in this case, Dr. Langdon – opens up the mouth.  That
> allows placement of this tube, and from the screen, you can see that
> this tube sort of follows the path of the tongue.

*Id.* at 7.  Then, "this video laryngoscope blade follows the path of the tongue and the oral

pharynx, and the tongue sits right here on top of the video laryngoscope."  *Id.* at 8.  Further,

> [o]nce the endotracheal tube is placed past the vocal cords, it needs
> to sit a few centimeters above the carina.  The carina is a portion
> of the lung in which the main tubes of the lung split apart.  Once that
> position is identified, then the tube is traditionally taped, and the
> tape is attached to the skin of the mouth.

*Id.* "When you first place the endotracheal tube, it is almost inevitable that the tongue will be in contact with the endotracheal tube because the tongue takes up a significant amount of space inside the mouth." *Id.* As to the video laryngoscope equipment, Dr. Moitra testified that it has a flat surface to distribute the pressure across the tongue, and that the use of video allows the performing doctor to pass the ET tube through the vocal cords with minimal pressure. *See id.* at 117.

Dr. Moitra testified that Mr. Papa's tongue necrosis could have been caused by shock, *see id.* at 125-126, and low blood perfusion, *see id.* at 123-24. Dr. Moitra stated that Mr. Papa's low blood pressure, *see id.* at 125-26, and multisystem organ failure, *see id.* at 126, evidenced shock. Dr. Moitra testified that Mr. Papa's mottled skin, *see id.* at 123, cyanotic skin, *see id.* at 124, and his capillary refill time was abnormally high. *See id.* at 124. Dr. Moitra testified that Mr. Papa's metabolic acidosis, based on his PH levels, is consistent with shock, low blood perfusion, and liver failure. *See id.* at 132-33. He has made "multiple observations of patients … who developed tongue necrosis from a shock state," in part related to those patient's requirements of vasopressors, which Mr. Papa required, which can cause patients to "develop ischemic parts of [their] body." *Id.* at 23-25. Dr. Moitra testified that it is "generally known in the medical community" that shock is "linked" to tongue necrosis. *Id.* at 24. Dr. Moitra explained that when a patient goes into shock, multisystem organ failure can result where the body's organs begin to shut down and do not function appropriately, including tongue necrosis. *See id.* at 15.

In addition to shock, Dr. Moitra testified that "there are multiple explanations and causes of ischemic tongue in patients who are critically ill," as Mr. Papa was. Tr. 3/28 at 29-30.[9]  Dr.

---

[9] In addition to shock and necrosis, Mr. Papa was experiencing cardiac failure, respiratory failure, *see* Tr. 3/28 at 126-27, and kidney failure. *See id.* at 129.

Moitra has seen a patient develop tongue necrosis in approximately twenty cases, *see id.* at 24, and stated that such a condition on those patients who were "in a similar situation" as compared to Mr. Papa "usually begins at the tip and then extends posteriorly." *Id.* at 48.  Dr. Moitra also identified coagulopathy,[10] which impeded Mr. Papa's ability to form clots, evidenced by bruising on his body, as most likely a "contributing factor to the tongue necrosis." *See id.* at 25.  Dr. Moitra also identified that the ET tube could have injured the tongue, which had already been "compromised with perfusion," *id.* at 8, 45, and that low blood pressure contributed to the kidney, liver, and tongue injuries. *See id.* at 46-48.

Plaintiffs sought to utilize the negligence doctrine of *res ipsa loquitur* to allow the Court to infer that negligence occurred, as Dr. Irwin could not identify a specific negligent act causing the tongue injury. *See* Pls.' Ex. 1 at 58; Dkt. No. 92 at 6-9.  *Res ipsa loquitur* is "an often confused and often misused doctrine that enables a jury presented only with circumstantial evidence to infer negligence simply from the fact that an event happened." *St. Paul Fire & Marine Ins. Co. v. City of N.Y.,* 907 F.2d 299, 302 (2d Cir. 1990); *see also Allstate Ins. Co. v. Vitality Physicians Grp. Prac. P.C.*, 537 F. Supp. 3d 533, 554 n.14 (S.D.N.Y. 2021) (quoting *County of Erie v. Colgan Air, Inc.*, 711 F.3d 147, 149 n.1 (2d Cir. 2013)).  For medical malpractice cases, "[t]o rely on the doctrine of *res ipsa loquitur*, a plaintiff must demonstrate that (1) the injury is of a kind that does not occur in the absence of someone's negligence, (2) the injury is caused by an agency or instrumentality within the exclusive control of the defendants, and (3) the injury is not due to any voluntary action on the part of the injured plaintiff." *Malmberg v. United States*, 814 F. Supp. 2d 159, 167 (N.D.N.Y. 2011) (citing *Simmons v. Neuman,* 50 A.D.3d 666, 667 (2d Dep't 2008) (citations omitted)).  "'[T]he doctrine concerns

---

[10] "[A] derangement in [one's] ability to clot."  Tr. 3/28 at 25.

circumstantial evidence which allows, but does not require, the fact finder to infer that the defendant was negligent … As such, a plaintiff need not eliminate all other possible causes of his or her injury but only reduce those causes such 'that the greater probability lies at defendant's door.'" *Id.* (citations omitted).

However, *res ipsa loquitur* does not apply where a plaintiff suffers an injury which "is a normal risk" of a surgical procedure. *Cruz v. United States,* No. 94-CV-6545, 1998 WL 13839, *9 (S.D.N.Y. Jan. 15, 1998). "New York courts apply *res ipsa loquitur* 'sparingly' because much of the medical treatment rendered to patients involves inherent risks which, even with adherence to the appropriate standard of care, cannot be eliminated." *Kennedy v. New York Presbyterian Hosp.*, No. 09-CV-6256, 2011 WL 2847839, *3 (S.D.N.Y. July 6, 2011). Under New York law, some medical malpractice cases that more commonly utilize *res ipsa loquitur* include where "an unexplained injury in an area which is remote from the operation occurs while the patient is anesthetized," *Babits v. Vassar Bros. Hosp.*, 287 A.D.2d 670, 671 (2d Dep't 2001), or where surgical equipment is left in patients' bodies post-operation. *See Dolan v. Jaeger*, 285 A.D.2d 844, 847 (3d Dep't 2001); *Kambat v. St. Francis Hosp.*, 89 N.Y.2d 489, 495, 497 (1997); *Downs v. United States*, No. 5:06-CV-396, 2009 WL 2611226, *4 (N.D.N.Y. Aug. 24, 2009); *Dermatossian v. New York City Transit Auth.*, 67 N.Y.2d 219, 226 (1986).

Here, the parties agreed that Mr. Papa was in shock when he arrived at the VA, *see* Dkt. No. 71 at ¶ 24, and both medical experts agreed that shock, in the absence of negligence, can cause tongue necrosis. The medical community is generally aware of such a risk, and both parties agreed it was not negligent to conduct an intubation. Additionally, the injury could have resulted from the pressure from the ET tube, rather than from a negligent use of the GlideScope during intubation. As such, since the injury to the tongue was one such injury that occurs without

negligence, the first factor necessary to utilize *res ipsa loquitur* is not satisfied.  Accordingly, the application of *res ipsa loquitur* is inappropriate in this case, and the Court declines to apply the permissible inference of negligence.

Plaintiffs additionally failed to establish by a preponderance of the evidence that Dr. Langdon acted negligently in her use of the GlideScope during intubation.  Mr. Papa was 86 years old when he arrived at the Albany VA in critical condition, with a long history of maladies.  The parties agreed that it was medically necessary to intubate Mr. Papa, even though he was in shock. The experts agreed that Dr. Langdon and other staff members correctly the prepared, positioned, and sedated Mr. Papa, and that nothing was omitted from the process.  The intubation was routine, emergent, and necessary, and followed the standard of care at the time.  The occurrence of a hematoma leading to necrosis after intubation does not establish that negligence occurred. Both experts agreed that other physiological occurrences, including shock, can lead to bruising of organs and other parts of the body, and that negligence did not cause the bruising to other parts of the body.  *See* Pls.' Ex. 1 at 96-97; Tr. 3/28 at 25.  Neither expert has ever seen or heard of such necrosis caused by a GlideScope during intubation, however both agreed that ET tubes can cause injuries or trauma to the tongue.  The Court found Dr. Moitra's explanations, including coagulopathy, shock, ET tube trauma, and low blood perfusion, and Dr. Irwin's conditional concessions, such as liver disease affecting the body's ability to clot and vasopressors causing skin breakdown, more persuasive than Dr. Irwin's assertion of negligence without a specific accusation of a negligent act besides alleged pressure from the GlideScope.  Accordingly, the Court finds

that Plaintiffs failed to prove based on the preponderance of the evidence that Dr. Langdon committed medical malpractice in her use of the GlideScope during Mr. Papa's initial intubation.[11]

### IV. CONCLUSION

After carefully reviewing the parties' pre-trial submissions, the trial transcript and exhibits, and the parties' post-trial briefs, the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that the Clerk of the Court shall enter judgment in Defendant's favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated:  July 19, 2023
      Albany, New York

Mae A. D'Agostino
U.S. District Judge

---

[11] Having found Plaintiffs failed to establish the Government's negligence, the Court need not address proximate cause, nor reach the question of damages.